THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LUIS ORTIZ RODRÍGUEZ, Defendant and Appellant.

No. CR-72-27. Decided November 27, 1972.

*José Torres Ortiz* for appellant. *Gilberto Gierbolini, Solicitor General,* and *Candita R. Orlandi, Assistant Solicitor General,* for The People.

MR. JUSTICE MARTÍNEZ MUÑOZ delivered the opinion of the Court.

An information for murder in the first degree, which was later amended to one of murder in the second degree after the evidence of the case was presented was filed against appellant. There was allegation of subsequent degree, admitted by appellant, and, therefore, it was not made known to the jury. The jury returned a verdict of guilty for the crime of voluntary manslaughter by a majority vote of nine to three. The evidence for the prosecution was the following:

The forensic pathologist Dr. Loynaz testified that on October 5, 1967, he performed the autopsy upon the corpse of Martín Avila Ocasio. He found that the corpse had been dead for several days, although he could not state precisely the day of the death. He determined that the cause of the death was a severe blow[1] in the thoracic region that fractured several ribs in the back, fractured the right clavicle, and caused hemorrhages. He also found scratches on the knees and on the shinbones, but he did not find any blows in the abdomen, the neck or the head. He could not say what caused the blow; to questions of the defense, he said that it could have been a fall from a certain altitude or from a moving vehicle or along a ravine, although in this last case it would have been difficult unless the slope was very steep (Tr. Ev. pp. 16–33).

The parties stipulated that certain witnesses taken as a whole would testify that the deceased Martín Avila Ocasio

---

[1] When asked about the possibility of several blows, the witness testified that he was not sure, but that he believed it was more probable that only one blow was involved. (Tr. Ev. p. 29.)

and defendant Luis Ortiz Rodríguez were together on October 1, 1967, from 8:30 in the morning until 9:00 at night in several small coffee shops and restaurants in the towns of Bayamón, Naranjito, and Comerío. In said small coffee shops defendant and the deceased chatted cordially, drinking liquor and eating hors d'oeuvres, each paying indistinctly what had been consumed and leaving in a truck belonging to Truck Fleets, Inc., driven by defendant (Tr. Ev. pp. 34–37).

The testimony of José Antonio Cruz Hernández (Tr. Ev. pp. 38–68) basically consisted in testifying that on October 1, 1967, he lived in Ward Bayamoncito of Aguas Buenas; that on that day between 10:00 and 11:30 at night he was in the road-crossing of that ward when he saw a truck stop at a certain distance from him. A person alighted from the left-hand side of the truck and apparently he started looking for something by the roadside. Then he got into the truck, turned around and started on his way in the direction of the witness, passing by his side at a very great speed. Then the witness continued on his way to his home and on passing by the place where he had seen the truck stop, he saw by the roadside a man sitting on the ground, with black pants and a blue shirt with small squares, who was moaning with his hands crossed over his stomach. The witness continued on his way and upon reaching his house he told his mother to lock the door well because there was a drunk around and could come in. Three days after that incident he saw when they pulled out the deceased's corpse from a ravine that was close to the place where he had previously seen the man who was moaning. The corpse, he said, wore black pants and a blue shirt with small squares. On an occasion he said that he had not observed the truck well that he saw on the night of October 1 (Tr. Ev. p. 59), but when he was shown the photograph of the truck that defendant was driving that day he identified it as the same truck that he had seen on the night of October 1, 1967. (Tr. Ev. p. 64.)

Ismael Mendoza Santiago testified (Tr. Ev. pp. 71–113) that on October 1, 1967, he was a neighbor from ward Bayamoncito of Aguas Buenas and that that night, at about 11:30 he was watching television in his home. He heard the noise of a truck going up the road and, as it seemed odd at that hour, he took a look from the door and saw a truck passing by whose make and year he identified and he saw that it was "from the Fleet" (Tr. Ev. p. 72). Soon afterwards he heard the truck coming down again and once more go up passing in front of his house. A while after the witness saw the truck coming down again in reverse and go over a heap of rocks about four feet high, stopping further down with the right back part out of the pavement. After skidding for a while, the driver was able to move the truck forward. The driver alighted, walked towards the back and went around the back part of the truck. Then the witness saw that there were two persons standing quite close to one another; then the driver again got into the truck and started to move back. The witness then went to bed. In court the witness identified defendant as the driver of the truck and identified a photograph of the truck which the defendant was driving on October 1 as the same truck which he had seen that night. Besides, he testified that he saw when the corpse of the deceased was pulled out of the ravine or slope quite close to the place where he saw defendant get down from the truck on the night of October 1. Said corpse, according to the witness, wore a shirt with squares and dark pants.

Efraín Cintrón Santos (Tr. Ev. pp. 115–117) stated that he also resides in Parcelas Bayamoncito of Aguas Buenas; that on the night of October 1, 1967, he was in his home between 10:00 and 11:30 and he was going to bed when he heard the noise of a truck; that he took a look from the balcony and saw a truck turning around; that the truck was white with a "closed body." Next day while on his way to his work, at some distance from his house, he found the men-

tioned truck by a culvert on the road of Aguas Buenas. He took down the truck's license plate number, which coincides with the number appearing in the photograph of the truck that defendant-appellant was driving.

Natividad Pizarro (Tr. Ev. pp. 118–132) said that he was a tinsmith specialized in automobile locks. On October 18, 1967, he inspected the lock of the truck that defendant was driving on October 1 and determined that the lock was in good condition and that by the manner in which it had been constructed it would be extremely difficult for it to be opened accidentally by the person inside as well as by the movements of the truck.

The prosecuting attorney also introduced in evidence four photographs of the truck that defendant was driving, a photograph of the place where the truck stopped when seen by Ismael Mendoza Santiago and another photograph of the place where the corpse was found.

At the close of the opening statement by the prosecuting attorney the defense prayed for peremptory acquittal which was denied by the court. The defense submitted the case without introducing evidence, requesting that instructions be given to the jury on voluntary and involuntary manslaughter. The judge agreed to give instructions on murder in the second degree and on voluntary manslaughter, but he refused to give them on involuntary manslaughter because he considered there was no evidence on this last one.

On appeal the commission of two errors is assigned: (1) the evidence was insufficient to support the conviction and (2) the court should have charged the jury as to the offense of involuntary manslaughter.

Was the evidence sufficient to support the conviction for voluntary manslaughter? The evidence in this case is purely circumstantial; there was no witness whatsoever who testified that he had seen the defendant giving the mortal blow to the deceased, if such a thing occurred.

 It is known that in all criminal prosecutions it is indispensable for a conviction that the prosecution prove the corpus delicti, that is to say, the fact that an injury was produced by a criminal hand. I Wharton, *Criminal Evidence,* § 17 (1955, Supp. 1972). As to the degree of evidence required to establish the corpus delicti, the Solicitor General cites some cases to the effect that all that is required is prima facie evidence of the same, but a close examination of these cases shows that that doctrine—exception to the general rule that all the elements of the offense must be proved beyond reasonable doubt—is applicable only to the cases in which there has been some confession or admission on defendant's part. See 1 Underhill, *Criminal Evidence,* § 35 (1956, Supp. 1970), ("The corpus delicti must be proved beyond a reasonable doubt.") and § 36 ("It has been held that slighter evidence is needed to establish the corpus delicti when a confession is present.") ; cf. *People v. Castro Cruz,* 90 P.R.R. 201 (1964) ; *People v. Miranda Matta,* 88 P.R.R. 805 (1963) ; *People v. Hernández,* 75 P.R.R. 852 (1954) ; *People v. Ortiz,* 69 P.R.R. 349 (1948) ; *People v. Rivera,* 67 P.R.R. 275 (1947) ; *People v. Declet,* 65 P.R.R. 22 (1945) ; *People v. Truyol,* 36 P.R.R. 338 (1927) ; *People v. Matos,* 26 P.R.R. 520 (1918).

 In the past we have acknowledged that circumstantial evidence is essentially the same as the direct one and that both are weighed on the same criterion: to produce a conviction the evidence must prove the guilt beyond a reasonable doubt. That rule substitutes the one previously existing, which required that to produce a conviction the evidence must not only be compatible with defendant's guilt but incompatible with any other reasonable hypothesis of innocence. *People v. Bonilla,* 78 P.R.R. 144 (1955) ; followed, among others, by *People v. Pagán Medina,* 99 P.R.R. 731 (1971) and *People v. Pérez Escobar,* 91 P.R.R. 9 (1964). Even the corpus delicti may be established by circumstantial evidence.

*People* v. *Castro Cruz, supra; People* v. *Rivera, supra; People* v. *Declet, supra.*[2]

■ Commentator Wigmore[3] makes a very extensive analysis of circumstantial evidence on the basis of a tripartite classification of the circumstances which may be considered to establish defendant's guilt:

(a) *prospectant* circumstances: events prior to the crime and which point forward to its future commission (motive, plan, designs, etc.) ;

(b) *concomitant* circumstances: events simultaneous to the crime that permit that it be done by defendant (presence at the scene of the crime, access to the victim, etc.) ;

(c) *retrospectant* circumstances: events after the crime which suggest that the defendant did it (flight, concealment of evidence, etc.).

■ On the other hand, there are circumstances which tend to prove the *innocence* of a defendant, for example, the fondness or friendship between the defendant and the victim (prospective), the alibi (concomitant) and a normal behavior after the crime (retrospective).

We ask ourselves if any of the factors which the doctrine acknowledges as relevant to prove circumstantially defendant's guilt were present in this case.

First, we have the problem of corpus delicti. The evidence adduced to prove it was the testimony of pathologist Dr. Loynaz to the effect that Martín Avila Ocasio died as a result of a severe blow on the thoracic region, and the testimonies

---

[2] For more details as to circumstantial evidence and its application to different offenses, see *People* v. *Picó Vidal,* 99 P.R.R. 687 (1971) ; *People* v. *Sánchez Delgado,* 99 P.R.R. 255 (1970) ; *People* v. *Rodríguez Matos,* 98 P.R.R. 149 (1969) ; *People* v. *Rivera Antuna,* 88 P.R.R. 611 (1963) ; *People* v. *Juarbe,* 83 P.R.R. 719 (1961) ; and *People* v. *Bonilla,* 83 P.R.R. 286 (1961). In the case of theft, burglary, etc., the doctrine of "unexplained possession of objects which were recently stolen," which acknowledges a typical case of circumstantial evidence is well known. *People* v. *Arroyo Cortés, ante,* p. 340, and cases cited therein.

[3] 1 Wigmore, *On Evidence,* §§ 38 to 465 (3rd ed.).

of José A. Cruz Hernández and Ismael Mendoza Santiago to the effect that they saw when the corpse of Avila Ocasio was pulled out of a ravine in a rural ward where the deceased was unknown. This evidence does not establish a diaphanously clear case of death by criminal hand, as would be death by shooting (*People* v. *Salgado Velázquez*, 93 P.R.R. 370 (1966)), by stabbing (*People* v. *Madrigal*, 93 P.R.R. 842 (1967)), by quartering (*People* v. *Hernández Santiago*, 97 P.R.R. 509 (1969)), by hanging with a rope (*People* v. *Arocho Medina*, 93 P.R.R. 160 (1966)), or for other causes such as poisoning, explosives, etc. Neither does it appear clear that it was a natural or accidental death as the case of a fatal infectious disease would be. As a matter of fact, one of the main doubts in this case is what instrument or mechanism caused or was used to cause the fatal blow.

If there was a crime, what evidence was there to connect defendant with the commission of the same? The evidence establishes without any doubt that defendant and the victim were together on October 1, 1967, during the daytime and that they were probably together during the nighttime also very close to the place where the deceased's corpse later appeared. With that the presence of the accused at the scene of the crime and his access to the victim are established, factor which is not enough by itself to determine the guilt, but that may be taken into consideration together with other details. See *People* v. *Madrigal*, *supra*; *People* v. *Salgado Velázquez*, *supra*; *People* v. *Arocho Medina*, *supra*. This would be one of the "concomitant" circumstances of which Wigmore speaks. See also Wharton, *op. cit.*, § 185.

The Solicitor General emphasizes the fact that defendant hastily left the scene of the alleged crime leaving the deceased sitting by the roadside and complaining of some malaise with his arms crossed over his abdomen. Besides, next day the truck which defendant was driving was found parked by the side of the road at some distance from the scene of the crime.

These acts of defendant could be construed as an attempt to prevent being discovered, if he committed the alleged crime. To flee or to attempt to conceal the evidence of a crime is a circumstance which may be considered in determining defendant's guilt. See *People* v. *Hernández Santiago, supra; People* v. *Arocho Medina, supra;* Wharton, *op. cit.,* §§ 206 and 207. This would be, according to Wigmore, one of the "retrospectant" circumstances.

But there are several doubtful details. It does not appear clear, for example, that the deceased was mortally wounded when he was abandoned by defendant on the night of October 1, 1967. It is known that he was still alive and that the witness who saw him interpreted his condition as one of intoxication. The theory of intoxication finds support in the fact that he had been drinking liquor all day for more than twelve hours in a row. Besides, the deceased seemed to be complaining of pain in the abdomen, which is compatible with intoxication, but that would be strange if, as the forensic pathologist pointed out, he did not have any notable injuries in the abdomen and instead he was suffering from multiple and severe injuries in the thorax and in the clavicle. In that agonizing condition, according to the People's theory, the victim would have to move on his own until dropping at the bottom of a ravine that is close to the place where he was seen complaining.

As to the abandoned truck, it doesn't seem clear either that the intention of defendant was to conceal it, because the place where it was found—by the side of the road to Aguas Buenas—doesn't seem to be an adequate place to conceal a truck nor sufficiently separated from the scene of the crime for us to construe it as an intent to conceal defendant's presence in that place.

■ Opposite to the circumstances already stated, it must be noted that there exists another *exculpatory* circumstance which tends to favor defendant. The stipulated testimony of

several persons indicates that on the day of the events the defendant and the deceased were confraternizing cordially; they ate, they drank, and they went from one place to the other together and they shared the expenses of what they consumed. At no time during the day or the night was there any conflict or discussion seen between them. No possible motivation for the crime was adduced by the People. It is true that to prove the motivation is not essential for a conviction, but it is likewise true that if the prosecution establishes said motivation, that constitutes a factor which together with others may be considered to establish the guilt. As a matter of fact, when a conviction is produced relying on circumstantial evidence, the existence of a verified motive for the crime, such as profit, vengeance, or rage produced by a quarrel constitutes an important factor. Wharton, *op. cit.*, § 166.

■ The circumstances of this case are very suspicious. It seems logical to us that appellant has been thought of as a possible offender and that he has been prosecuted; but the different points left unknown by the evidence have produced in us a reasonable doubt as to his guilt. Perhaps, it can be attributed thereto that the jury returned a verdict (9 to 3) of *voluntary manslaughter*, which results strange since evidence of "sudden quarrel or heat of passion" was not presented. Section 203 of the Penal Code, 33 L.P.R.A. § 635.

The first error assigned was committed. On account of that the judgment appealed from will be reversed acquitting appellant freely.